**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 3, 2001**

UNIVERSAL UNDERWRITERS INSURANCE
COMPANY, as Subrogee of Betten
Toyota and BETTEN TOYOTA,

    Plaintiffs-Appellees,

v                                              No. 114900

NANCY KNEELAND,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

    We granted leave to determine whether a contractual provision that assigned "all responsibility for damages" to defendant while she rented a vehicle contravenes our no-fault act, MCL 500.3101 *et seq.*, and thereby voids the parties' contract. We hold that the no-fault act does not prevent

contracting parties from voluntarily allocating liability for collision damage to a rented vehicle. We thus affirm the judgment of the Court of Appeals.

## I. Underlying facts and procedural history

While repairing defendant's vehicle, plaintiff Betten Toyota loaned her a vehicle. Defendant and a Betten employee signed a "courtesy car agreement" that stated:

> 2. Renter agrees to replace gasoline used.
>
> 3. Renter agrees to pay cash for rental charge.
>
> 4. *Renter agrees to assume all responsibility for damages while vehicle is in his possession.*
>
> 5. Renter agrees not to sublet or loan the car to anyone. [Emphasis added.]

While driving the rented vehicle, plaintiff was involved in an accident. Total collision damages amounted to $3,738.49. Betten Toyota absorbed $1,000 as a deductible; plaintiff Universal Underwriters Insurance Company, Betten's insurer, paid the remainder.

Betten and Universal sought recovery from defendant, but she refused to pay. Plaintiffs then commenced this action alleging breach of the courtesy car agreement. Universal seeks recovery as Betten's subrogee of the $2,738.49 it paid to repair the rented vehicle; Betten demands payment of the $1,000 deductible.

Plaintiffs moved for summary disposition under MCR

2

2.116(C)(10), arguing that no genuine issue of material fact existed regarding defendant's contractual liability. The district court instead granted summary disposition for defendant under MCR 2.116(I)(2).[1] It relied on an unpublished Court of Appeals opinion to conclude that the no-fault act does not allow contractual allocation of liability for collision damages. *Universal Underwriters Ins Co v Stout*, unpublished opinion per curiam, issued February 2, 1996 (Docket No. 171069). The circuit court affirmed.

The Court of Appeals reversed and remanded for entry of a judgment in plaintiffs' favor unless the district court "determines that defendant has defenses that have not yet been addressed, in which case the court shall conduct proceedings consistent with" the Court of Appeals opinion. 235 Mich App 646, 662; 599 NW2d 519 (1999). It noted that while the no-fault act abrogated tort liability arising from the ownership, maintenance, or use of a motor vehicle (except in certain circumstances),[2] it did *not* abolish contractual liability. See *Kinnunen v Bohlinger*, 128 Mich App 635, 638; 341 NW2d 167 (1983); *Nat'l Ben Franklin Ins Co v Bakhaus Contractors, Inc*, 124 Mich App 510, 513; 335 NW2d 70 (1983).

---

[1]The rule provides: "If it appears that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party."

[2]MCL 500.3135(2).

3

The Court of Appeals distinguished this Court's peremptory order in *Universal Underwriters Ins Co v Vallejo*, 436 Mich 873; 461 NW2d 364 (1989). *Vallejo* held that the defendant-renter was entitled to summary disposition on the insurer's claim for collision damages to a rented vehicle:

> Although the trial court gave the plaintiff insurer numerous opportunities to explain, with specific factual allegations, how its conclusory allegation of an express or implied contract of bailment differentiated this case from any other situation in which a permissive user of a car is involved in a collision and therefore cannot return the car to its owner in an undamaged condition, the plaintiff repeatedly failed to do so. Under these circumstances, the trial court correctly granted the defendant's motion for summary disposition. By operation of the pertinent insurance statutes, e.g., MCL 257.520(b)(2); MSA 9.2220(b)(2) and MCL 500.3009; MSA 24.13009, the defendant appears to have been insured by the plaintiff against the very loss at issue in this case, since a standard automobile policy typically insures such a permissive driver "against loss from the liability imposed by law for damages arising out of the ownership, maintenance or use of" a motor vehicle. [*Id.*]

The Court of Appeals noted that, while the plaintiff in *Vallejo* relied on a common-law bailment theory, plaintiff here seeks recovery under the express terms of a written agreement. The Court did not read *Vallejo* "as a blanket rejection of all contract claims seeking to hold a permissive user responsible for damage to a borrowed vehicle. Rather, we understand the order as rejecting the insurer's effort to convert a simple, permissive-user, tort liability case into a contract case by

4

alleging an express or implied contract of bailment, without providing specific factual allegations that would support such a distinction." *Kneeland, supra* at 659. The Court reasoned that *Vallejo* suggested the possibility of a different result where there is proof of an express contract.

## II. Standard of Review

We review de novo a grant of summary disposition under MCR 2.116(C)(10). *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999). The issue under review is a question of law, i.e., whether the no-fault act prevents contractual assignment of liability for collision damages. We review questions of law de novo. *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).

## III. Contractual Interpretation

Before deciding whether the courtesy car agreement contravenes public policy, we must determine what the contract says. Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement. *Henderson v State Farm Fire & Casualty Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). A contract is ambiguous if its provisions may reasonably be understood in different ways. *Farm Bureau Ins Co v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999).

5

The fourth provision of the courtesy car agreement states: "Renter agrees to assume all responsibility for damages while vehicle is in his possession." This language clearly imposes liability on defendant. The contract is unclear, however, regarding the *extent* of the shift of liability. The provision refers to "damages," but does not explicate precisely the categories of damages that defendant has agreed to pay.

The general term "damages" could refer to *any* harm caused to a third party's person or property, i.e., it could reach damages for which no-fault insurance coverage is mandatory. See, e.g., MCL 500.3107, 500.3121. A shift of liability to that extent might contravene the no-fault act. Cf. *State Farm v Enterprise Leasing*, 452 Mich 25, 36; 549 NW2d 345 (1996).[3]

Another reasonable interpretation of the contract is available, however. Black's Law Dictionary (6th ed) defines "damages" as "[a] pecuniary compensation or indemnity, *which may be recovered in the courts* by any person who has suffered a loss, detriment, or injury, whether to his person, property, or rights . . . ." The parties may reasonably have intended

---

[3]We express no view regarding whether *State Farm* would control the legality of the contract here. This agreement and the one addressed in *State Farm* are arguably different in scope and effect. We merely observe that an argument is available that the parties' agreement, if it reaches beyond optional collision damages, is illegal.

to limit the meaning of the word "damages" to losses for which a legal right of recovery is available.

An ambiguity arises also because the contract shifts liability for damages "while [the] vehicle is in [defendant's] possession." Damages to the vehicle itself are likely to occur while the renter possesses the vehicle. But other types of damages, including wage loss and medical expenses, often arise *after* the rental period has ended. The contract does not clearly shift liability for the latter kinds of damages.

We thus conclude that the words of the contract may reasonably be understood in different ways. This ambiguity requires us to assume that the parties knew the law and wished to comply with it. See 3 Corbin, Contracts, § 546, pp 170-171:

> [I]t is very commonly stated that when the terms of agreement have two possible interpretations, by one of which the agreement would create a valid contract and by the other it would be void or illegal, the former will be preferred. This is an advisory rule of interpretation, since it is believed that the parties intend their agreement to be valid rather than invalid, lawful rather than unlawful, and honest and effective rather than fraudulent and voidable.

See also *Walsh v Schlecht*, 429 US 401, 408; 97 S Ct 679; 50 L Ed 2d 641 (1977) ("Since a general rule of construction presumes the legality and enforceability of contracts, . . . ambiguously worded contracts should not be interpreted to

7

render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable"); *Stillman v Goldfarb*, 172 Mich App 231, 239; 431 NW2d 247 (1988).

We follow these authorities and presume that the parties intended to enter a valid, enforceable agreement and that the contract thus does not shift liability for damages that may not legally be reallocated.

## IV. The dissent's approach

The dissent first construes the contract against its drafter and the drafter's subrogee by extending the shift of liability beyond collision damages. The dissent would then invalidate the contract on the basis of its allegedly illegal reach. We reject that analysis.

The dissent misapplies the rule requiring that contractual ambiguities be construed against the drafter by using the rule not to interpret the contract, but to *invalidate* it. As discussed above, courts will presume that a contract is legal if a reasonable interpretation supporting the legality of the contract is available. The dissent instead concludes that the parties meant to accomplish illegal ends by their agreement.

Moreover, the dissent does not find an ambiguity regarding whether defendant's liability extends *to* collision

**8**

damages.  As discussed above, the only ambiguity is whether the contract shifted liability *beyond* collision damages.  A reasonable interpretation is not available—and even defendant does not contend—that she did not agree to liability for collision damages.

A proper application of the rule of construction against the drafter would adopt the interpretation making defendant liable to the *least* extent possible, i.e., for collision damages only.  Thus, regardless of whether one applies the rule of construction against the drafter or the rule presuming the legality of contracts, the same result is reached: the contract shifts liability for collision damages only.

V. Is the assignment of collision damages void?

Having concluded that the contract shifts liability for collision damages only, we now consider whether the no-fault act prohibits the parties' voluntary allocation of responsibility.  To decide this question, we must consider relevant statutory provisions.  *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999), articulated the proper mode of interpretation:

> The rules of statutory construction are well established.  The foremost rule, and our primary task in construing a statute, is to discern and give effect to the intent of the Legislature. *Murphy v Michigan Bell Telephone Co*, 447 Mich 93, 98; 523 NW2d 310 (1994).  See also *Nation v W D E Electric Co*, 454 Mich 489, 494; 563 NW2d 233 (1997).  This task begins by examining the language

**9**

of the statute itself. The words of a statute provide "the most reliable evidence of its intent . . . ." *United States v Turkette*, 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981). If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. No further judicial construction is required or permitted. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996).

Our no-fault act *requires* owners to carry certain categories of insurance. Mandatory coverages include personal injury protection and property protection benefits. MCL 500.3107; MCL 500.3121. Other types of coverage, however, are not mandatory, but purely a matter of contract. Collision coverage plainly falls into the latter category: our no-fault scheme does not mandate it.

Additionally, § 3135 of our no-fault act, MCL 500.3135, expressly abolishes tort liability arising from the ownership, maintenance, or use of a motor vehicle (with some exceptions). The statutory language does *not* reflect an intent to abolish *contractual* liability for collision damages, an *optional* form of insurance *not required by the no-fault act*. See *Kinnunen*, *supra* at 639 ("Had the Legislature intended to abrogate contractual liability as well, the words *any* 'liability arising out of the ownership, maintenance, or use of a motor vehicle' could easily have been substituted"); *Ben Franklin Ins*, *supra* at 513 ("Nothing in the no-fault system relieves a

motor vehicle operator of liability which he may have incurred in contract").[4]

Further, the Court of Appeals correctly ruled that *Vallejo* is distinguishable. The limited reasoning in that peremptory order offers little guidance. It appears, however, that the insurer in *Vallejo* was relying on a common-law bailment theory. The order does not mention an express written agreement.

*Vallejo* prevents a party from converting a possible tort claim into a "contract" claim by simply alleging a bailment and thereby subverting subsection 3135(2). Those concerns do not arise where parties have expressly agreed in writing to allocate their respective duties.

## VI. Subrogation

Our grant order asked the parties to address "whether, if defendant is held to be liable for damage to the automobile at issue based on her contract with plaintiff Betten Toyota, her liability is limited to the $1,000 deductible in Betten Toyota's insurance policy covering that automobile on the ground that this was the extent of the damages suffered by

---

[4]We emphasize that our holding is limited to contract claims for *collision* damages. We offer no view regarding the legality of a contract purporting to shift liability for other categories of damages.

Betten Toyota." 462 Mich 911 (2000). We hold that damages are not limited to the amount of the deductible.

Betten incurred $3,738.49 in damages to its vehicle, but had to pay only $1,000; Universal paid the balance. The plain terms of Betten's insurance policy grant Universal a right of subrogation to Betten's cause of action against defendant:

> Subrogation—You and each insured must do all in their power to preserve their rights to recover from others. *Once we have made a payment under this policy, your or an insured's rights to recover from others become our rights.*

Defendant has not articulated a reason why Universal may not exercise its contractual right of subrogation.

Significantly, defendant did not challenge Universal's subrogee status below. In fact, her attorney implicitly acknowledged Universal's right of subrogation during proceedings in the district court:

> *Mr. Arndt* [defense counsel]: . . . *I don't think either one of the parties made a distinction between Universal's claim or Betten's claim.* Certainly Universal's claim is derivative of their *subragor* (sic) *insured Betten.* I guess it would be our position that the case law and specifically *Universal* versus *Valajo* [sic] addresses both not only the insurer but the owners responsibility to make sure that there is adequate protection and insurance coverage on the vehicle. I think that the case law that you've relied upon in determining and adjudicating the issues of liability between Universal and Kneeland are equally applicable to Betten and Kneeland. *That there would be no distinction between the two claims, whether it was insured or uninsured.* [Emphasis added.]

**12**

Defendant has thus forfeited any claim that Universal has no right of subrogation. *Smith v Musgrove*, 372 Mich 329, 337; 125 NW2d 869 (1964); *Munson Medical Center v Auto Club Ins Ass'n*, 218 Mich App 375, 388; 554 NW2d 49 (1996).

## VII. Conclusion

The no-fault act does not invalidate the parties' written agreement to assign liability for collision damages to defendant. Universal has a right of subrogation under the express terms of its insurance policy with Betten to seek recovery of the amount it paid to repair the rented vehicle. Accordingly, we affirm the judgment of the Court of Appeals.

TAYLOR, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, C.J.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

UNIVERSAL UNDERWRITERS INSURANCE
COMPANY, as Subrogee of Betten
Toyota and BETTEN TOYOTA,

    Plaintiffs-Appellees,

v                                     No. 114900

NANCY KNEELAND,

    Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

Because the majority opinion in this case is contrary to well-established principles of contract law, I must dissent. I would reverse the decision below and reinstate summary disposition in favor of the defendant.

This case presents two questions: (1) whether a party may contractually assume liability for damages to a borrowed vehicle and (2) if liability can be contractually assumed, whether the defendant assumed liability pursuant to a courtesy car agreement. I would hold that liability can be contractually shifted, but that the instant courtesy car

agreement cannot be enforced to impose liability on the defendant.

I

The defendant borrowed a loaner car from Betten Toyota while Betten was servicing her vehicle. Before taking possession of the loaner car, the defendant was required to sign a document entitled "Courtesy Car Agreement." The text of the agreement was as follows:

Courtesy Car Agreement

1. ~~Rental fee ONLY $28.00 per day.~~

2. Renter agrees to replace gasoline used.

3. Renter agrees to pay cash for rental charge.

4. Renter agrees to assume all responsibility for damages while vehicle is in his possession.

5. Renter agrees not to sublet or loan the car to anyone.

The agreement was printed on Betten stationery.

The defendant was involved in an automobile accident for which she bore no fault. Rather, two other vehicles collided with each other, and the force of the impact pushed one of those vehicles into the loaner car. The plaintiffs are seeking to recover collision damages. Both plaintiffs assert that the defendant is liable for the full amount of damages sustained pursuant to clause 4 of the courtesy car agreement.

The defendant asserts that Betten Toyota formed a

2

bailment contract with her by loaning her a vehicle. She further argues that, pursuant to the bailment contract, she was shielded from liability because the no-fault act, MCL 500.3101 *et seq.*, and financial responsibility act, MCL 257.520(g), require the owner of an automobile and the owner's insurer to provide coverage for permissive users.

According to the plaintiffs, this case sounds purely in contract. While the no-fault act abrogated tort immunity, it did not abrogate contractual liability. The plaintiffs thus contend that the no-fault act would not bar their claims, citing *Kinnunen v Bollinger,* 128 Mich App 635, 638; 341 NW2d 167 (1983); *Nat'l Ben Franklin Ins Co v Bakhaus Contractors, Inc*, 124 Mich App 510, 513; 335 NW2d 70 (1983).

The broader question posed by this case is whether a party may contractually assume liability for damages to a borrowed vehicle even though Michigan's no-fault law, precedent, and common-law principles would normally place liability on the lender absent any contractual agreement to the contrary. If liability can be contractually assumed, then we must also resolve whether the defendant assumed liability pursuant to the courtesy car agreement.

The genesis of the arguments raised by the present parties can be traced to this Court's decision in *Universal Underwriters v Vallejo*, 436 Mich 873 (1990). *Vallejo* was a

3

peremptory reversal, which, in its entirety, provided as follows:

> In lieu of granting leave to appeal, the August 21, 1989, judgment of the Court of Appeals is reversed [179 Mich App 637; 446 NW2d 510 (1989)], and the case is remanded to the Saginaw Circuit Court for entry of judgment in favor of the defendant. Although the trial court gave the plaintiff insurer numerous opportunities to explain, with specific factual allegations, how its conclusory allegation of an express or implied contract of bailment differentiated this case from *any other situation in which a permissive user of a car is involved in a collision* and therefore cannot return the car to its owner in an undamaged condition, the plaintiff repeatedly failed to do so. Under these circumstances, the trial court correctly granted the defendant's motion for summary disposition. By operation of the pertinent insurance statutes, e.g., MCL 257.520(b)(2); MSA 9.2220(b)(2) and MCL 500.3009; MSA 24.13009, the *defendant appears to have been insured by the plaintiff against the very loss at issue in this case*, since a *standard automobile policy* typically insures such a permissive driver "against loss from the liability imposed by law for damages arising out of the ownership, maintenance *or use of*" a motor vehicle. Jurisdiction is not retained. [Emphasis added.]

The defendant interprets *Vallejo* as holding that no express or implied bailment action lies against a permissive user of a loaner vehicle. In the defendant's view, *Vallejo* was not premised on the insurer's failure to factually establish a contractual relationship. Rather, *Vallejo* specifically found the lack of an express agreement to be inconsequential. The Court held that a bailment contract could not supersede the insurer's statutory duty to supply

4

insurance to permissive drivers.

The plaintiffs, on the other hand, argue that *Vallejo* is inapposite. They assert that, where the action against the defendant is purely for breach of contract and is not a tort action arising out of rights implicit in a bailment relationship, *Vallejo* and the no-fault act do not bar plaintiffs' claims. Instead, the plaintiffs urge us to interpret *Vallejo* as determining only whether a bailment could give rise to liability. While *Vallejo* recognized that any *tort* liability arising out of a bailment would be barred pursuant to the no-fault act, the plaintiffs posit that it did not foreclose the possibility that a defendant could be held liable if the parties agreed to rights and responsibilities extending beyond the bailment situation. The plaintiffs recognize *Vallejo* as accepting that a bailment relationship alone would not shift liability to the defendant, but they argue that *Vallejo* actually held only that the plaintiff failed to prove the existence of any rights beyond those that would exist in a bailment situation.

II

The Court of Appeals noted that the no-fault act bars tort liability but not contractual liability, and held that the defendant could be bound by her agreement to assume all responsibility for damages while the vehicle was in her

5

possession. 235 Mich App 658-659. It then distinguished *Vallejo* from this case on the ground that *Vallejo* did not involve an express contract. Further, the Court expressly stated that *Vallejo* was not intended to shield permissive users from liability expressly assumed by contract. The Court wrote:

> [I]n any permissive user case, except the unusual one in which a bailment is expressly disavowed, it can be alleged that there is an implied or express contract of bailment, and therefore, an enforceable contractual duty. The Supreme Court declined to recognize such broad-based contractual liability in these circumstances. The Court's express reference to the insurer's failure to support with factual allegations its efforts to differentiate the case from any other permissive-user situation implies that if the insurer *had* successfully demonstrated the existence of an express contractual assumption of responsibility for damage to the vehicle, the defendant might not have been granted summary disposition. Thus, *Vallejo* did not say that the existence of an express contract would not differentiate the case from any other permissive-user situation. Rather, it suggested that the potential different result did exist, but that the plaintiff insurer had failed to provide proof sufficient to support a different result. [235 Mich App 659-660 (emphasis in original).]

After determining that *Vallejo* was not intended to bar all contract claims brought against permissive users, the Court of Appeals concluded that plaintiffs could assert a contract claim against the defendant because of her express assumption of liability. Therefore, the Court reversed the circuit court's affirmance of summary disposition for the defendant.

6

I agree with the Court of Appeals that *Vallejo* should not be read as "a blanket rejection of all contract claims seeking to hold a permissive user responsible for damage to a borrowed vehicle." 235 Mich App 659. While *Vallejo* limited the extent to which liability can be shifted to a permissive driver of a loaned automobile, it did so under circumstances where the insurer had failed to assert a factual basis for its contract claim. The Court's order recognized the general rule that a bailee must return property to his bailor in an undamaged condition. However, *Vallejo* then recognized that Michigan's pertinent insurance statutes, MCL 257.520(b)(2) and MCL 500.3009, modify the general rule. Through those statutes, the Legislature chose to offset the costs and problems associated with automobile collisions by requiring that automobile owners carry insurance. *Vallejo* recognized that standard automobile policies contain language covering use by permissive drivers, and held that the plaintiff insurer had failed to prove that liability had somehow been shifted back to the defendant.

I interpret *Vallejo* as holding that the lender, rather than the permissive user, must pay for collision damages under the lender's insurance policy unless: (1) it is proven that the policy does not extend to permissive drivers, or (2) the

lender or insurer carries his burden of differentiating his case from the usual situation where a permissive user of a car is involved in a collision.  The plaintiffs' own brief categorizes its claim as "squarely one for breach of contract."  Thus, this is not a case where the insurer refused to pay on the grounds that the driver was not covered by the terms of the policy between the insured and the dealer.  Instead, the complaint alleged that the contract between Betten and Kneeland shifted liability to Kneeland.  When she refused to pay, she allegedly breached the courtesy car agreement.  Therefore, this case hinges on the second *Vallejo* inquiry.  Pursuant to *Vallejo*, the plaintiffs must prove that the courtesy car agreement differentiates this case from the usual situation where a permissive user of a car is involved in a collision.

The plaintiffs claim that this case can be distinguished from *Vallejo* because the instant defendant assumed all responsibility for damages.  While I agree with the plaintiffs that *Vallejo* does not automatically bar recovery in cases where the lender proves that the permissive driver has assumed liability pursuant to a valid contract, I do not agree that liability was shifted in the present case.

The majority acknowledges the potential shift of tort liability that could occur were this Court to hold that the

8

contract is unambiguous as the plaintiffs suggest. Because of the potential problem, the majority offers another "reasonable interpretation of the contract." Slip op at 6. In the majority's words, "[t]he parties may reasonably have intended to limit the meaning of the word 'damages' to losses for which a legal right of recovery is available." Slip op at 7.

I agree with the majority that the courtesy car agreement in this case is ambiguous, and may be interpreted in a fashion that would avoid illegality. However, I disagree strongly with the majority's decision to construct a decision favorable to the plaintiffs, rather than construing the contract against the drafter, as we are bound to do. See, e.g., *Vanguard Ins Co v Clarke*, 438 Mich 463, 471-472; 475 NW2d 48 (1991); *Raska v Farm Bureau Mut Ins Co*, 412 Mich 355, 361-362; 314 NW2d 440 (1982). See also 2 Restatement Contracts, 2d, § 206, p 105 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words"); 11 Williston, Contracts, § 32.12, p 471 (since the language is within the control of the drafter, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter); 5 Corbin, Contracts, § 24.27, pp 282-283; 17A Am Jur 2d Contracts, § 348, pp 360-361 (It is fundamental that doubtful language in

9

a contract should be interpreted most strongly against the party who has selected the language).

Two opposing interpretations of the courtesy car agreement are offered. In the plaintiffs' view, by signing the courtesy car agreement, the defendant agreed to be an insurer against damages to the automobile. The defendant contends that she read the agreement as meaning only that she would be responsible for her own negligence, and that she assumed that the car was insured by the dealership. Here, the drafter was Betten. Construing the agreement against Betten is proper because, as the drafter, Betten had the opportunity of drafting the language in a manner that avoided any ambiguity or dispute. Thus, I would resolve the courtesy car agreement in the defendant's favor, in accordance with well-established contract principles.

The document was a one-page form contract to which no insurer was a party and that never mentioned insurance. The dealership never informed the defendant that she needed to obtain her own insurance, nor did it inform the defendant that she would be liable for damages caused by the negligence of others. The courtesy car agreement also did not mention collision damages. It is not unreasonable for defendant to have assumed that she would be covered by a standard automobile policy between the dealer and its insurer. In this

10

respect, the present case is similar to *Vallejo*.  While *Vallejo* left open the possibility that contractual liability could be shifted to a permissive user, *Vallejo* also recognized that the burden was upon the plaintiff insurer to prove that liability had been so shifted.  Here, the plaintiffs point only to overbroad language that in no way mentions insurance obligations.  Thus, I would conclude that the plaintiff failed to bear its burden of proving that collision damages were validly shifted.

Contrary to the majority's assertion, my approach is not a method of invalidating the contract.  It is, instead, a recognition that, when choosing between valid constructions of an ambiguous contract, we must choose the construction that goes against the drafter of the ambiguous language.  Here, the construction offered by the defendant would not invalidate the courtesy car agreement; rather, it would limit the scope of the agreement.

IV

The majority chooses to construe the contract in a manner that would be favorable to the plaintiffs who drafted the ambiguous contract.  I cannot join the majority's decision to find in favor of the plaintiffs when the agreement signed by the defendant contained a provision that must be interpreted as ambiguous or void against public policy.

11

I would hold that the defendant is not liable under the courtesy car agreement.  The plaintiffs have failed to carry their burden of establishing that a valid contract existed and of differentiating this case from the usual situation where a permissive user of a car is involved in a collision. Therefore, I would reverse and reinstate summary disposition in favor of the defendant.

WEAVER and KELLY, JJ., concurred with CAVANAGH, J.